**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA;

*ex rel.* SIMON KENT
15112 Christopher Lane
Frisco, Texas 75035,

    Plaintiff,

   v.

MEDTRONIC PLC,
710 Medtronic Parkway
Minneapolis, Minnesota
55432-5604

NURSE NAVIGATION SOLUTIONS, LLC,
812 Luzerne Street
Johnstown, Pennsylvania 15905

AMY HOHMAN-RUNKLE
812 Luzerne Street
Johnstown, Pennsylvania 15905

CHRISTOPHER WAYNE TAYLOR, M.D.,
1425 Rock Springs Road
Harrison, Arkansas 72601

UROGPO
1250 Linda Street Suite 103
Rocky River, Ohio 44116, and

PPS ANALYTICS,
4807 Rockside Road Suite 720
Independence, Ohio 44131,

    Defendants.

Case: 1:21–cv–00466 JURY DEMAND
Assigned To : Boasberg, James E.
Assign. Date : 2/19/2021
Description: Gen. Civil. (E–DECK)

Civil Action No. _____

***QUI TAM* ACTION
FILED UNDER SEAL**

**COMPLAINT FOR VIOLATIONS OF:**

 **THE FEDERAL FALSE CLAIMS
 ACT, 31 U.S.C. §§ 3729–3733**

I.    **INTRODUCTION**

1.      When two different conservative therapies for overactive bladder (OAB) – medication or therapy medically considered the best first options – cannot help, an individual can turn to what is known as a "third-line therapy."

2.      There are three approved third-line therapies for OAB: Botox, tibial nerve stimulation, and InterStim. Botox is manufactured by Allergan. It involves injections of Botox into the bladder wall to reduce overactivity, and Medicare reimburses a physician hundreds of dollars to perform the procedure. Both Medtronic (Percutaneous Tibial Neuromodulation - PTNM) and Laborie (Percutaneous Tibial Nerve Stimulation - PTNS) offer tibial nerve stimulation. This therapy is performed in the office setting, involves inserting a needle in the ankle to stimulate a nerve, and Medicare reimburses around $100 per session. InterStim is also manufactured by Medtronic, but, unlike Botox and PTNM, InterStim is an invasive procedure that requires the implantation of a lead and a neurostimulator. Medicare reimburses as much as $31,000 for a full InterStim procedure.

3.      InterStim is a two-part procedure. First a patient must undergo one of two initial tests and must demonstrate a 50 percent or more improvement in symptoms to be eligible for the permanent implant. As explained further in paragraph 49 below, the two tests are a PNE, referred to by Medtronic as a Basic Evaluation, and a Stage 1 implant, referred to by Medtronic as an Advanced Evaluation.

4.      Medtronic grossed over $125 million in the fourth quarter of 2020 from Interstim and makes over $500 million annually from the sale of InterStim. Most InterStim sales are ultimately paid for by Medicare.

5.      Medtronic aggressively markets InterStim. Medtronic's sales representatives, who are not physicians and do not have medical training, act as quasi-medical professionals, advising

on InterStim procedures, operating as the main point of contact for the patients, and providing many of the patient-facing services traditionally provided by a physician or their staff.

6.     Medtronic also improperly pushes the overuse of InterStim through various, improper schemes including creation of a shadow sales force through nurse navigators, offering a software analytics tool at below cost, offering improper rebates that are conditioned on a physician increasing their use of InterStim, and ultimately forging records to improperly allow facilities to pass a Medicare Recovery Audit Contractor (RAC) audit.

7.     Medtronic's shadow sales force operates through a purported third-party navigation service, Nurse Navigator Solutions LLC (NNS). Medtronic pays kickbacks to NNS in significant indirect financial support in exchange for NNS inappropriately encouraging physicians to overprescribe InterStim.

8.     The practice of nurse navigation was originally developed for complex oncology treatments involving coordination of multiple specialties and therapies over a period of months or years. The practice was designed to help patients understand and negotiate the complex medical treatment process common for many cancer patients. Medtronic is the first company to implement navigation for an elective treatment involving only a single specialty. Instead of assisting patients through difficult and confusing process, Medtronic developed OAB navigation for one purpose: to boost sales of InterStim.

9.     Upon information and belief, Chris Runkle, a current Regional Sales Director at Medtronic, devised the scheme when he was a Strategic Account Manager. As a Strategic Account Manager, Mr. Runkle's job was to support the InterStim sales team. Mr. Runkle realized the biggest bottleneck to InterStim sales was moving patients into third-line therapy and then encouraging those patients to choose InterStim rather than other less costly and less invasive

options. Mr. Runkle devised a scheme whereby Medtronic offers a navigation service to physicians, ostensibly to help patients suffering from ineffective treatment understand third-line therapy is an option, through a controlled third-party. In actuality, the navigators are trained to operate as shadow Medtronic sales representatives pushing the use and overuse of InterStim.

10.    NNS was created on September 10, 2015, upon information and belief by Mr. Runkle's wife, Amy Hohman-Runkle. The relationship between Mr. Runkle and NNS is not disclosed to NNS's clients or the patients with whom NNS interacts.

11.    Nurse navigation for OAB is only offered through Medtronic; NNS does not have any direct marketing or organic clients. NNS instead outsources most of its marketing and front office support to Medtronic at no cost.

12.    In exchange, NNS operates as an effective, yet hidden, sales force for Medtronic. Medtronic sales representatives train the Nurse Navigation staff as Medtronic sales representatives and teach the NNS staff to pitch InterStim and criticize other third-line therapies.

13.    NNS is sold to physicians as a "therapy agnostic" service.  In actuality, the entire purpose of NNS is to promote the use, and overuse, of InterStim. However, unlike Medtronic's traditional in-house sales force, neither Medtronic nor NNS discloses to physicians that NNS is aligned with Medtronic. Furthermore, as a third-party, NNS does not fit within any exception to the Anti-Kickback Statute.

14.    NNS utilizes a software program, PPS Analytics, that is offered for OAB exclusively through Medtronic, upon information and belief, at less than cost.

15.    Additionally, Medtronic, through the group purchasing organization UroGPO, offers kickbacks designed to improperly incentivize physicians to overprescribe InterStim. Medtronic offers rebates based on the annual growth of a physician's use of InterStim to

-4-

encourage overuse and stave off competition. These rebates inherently require a practice to grow their use of InterStim and therefore operate as a kickback.

16. Medtronic also regularly provides false documents to RACs. Physicians routinely outsource the requirement to document a patient's voiding records to a Medtronic sales representative or a third-party company hired by Medtronic. Despite the clear requirement that such records be documented contemporaneously, Medtronic sales representatives often fail to take any written records at all and instead verbally inform the physician that the patient has improved. The physician therefore does not actually know whether InterStim is effective for the patient or whether the patient is in fact eligible for a full InterStim implant. Rather, the physician relies entirely on a verbal recitation from a Medtronic sales representative whose compensation is directly tied to InterStim use. Without properly documented information, a physician cannot properly determine whether InterStim is medically necessary—yet because the financial remuneration is so high for both physician and Medtronic, the device is implanted anyway.

17. When the RAC requests the records necessary to support the physician's decision to implant InterStim, the doctor and the facility where the physician performed the implant turn to Medtronic. If Medtronic also has no records, the sales representative will create false and fraudulent records to make it appear as though the procedure was medically necessary.

18. Had the RAC known Medtronic was providing false and fraudulent documents, it would have demanded reimbursement. Had the United States known the physician's decision was not supported by sufficient evidence to support the efficacy of InterStim, the United States would not have paid the claim.

19. Finally, Medtronic often supports physicians it knows are overusing InterStim because it financially benefits when they do. Indeed, Medtronic focuses its sales and support on

the highest InterStim prescribers and encourages them to use more. The expected and understandable result is unscrupulous physicians overprescribe InterStim. Illustrative of Medtronic's laser-focus on generating revenue from InterStim, Dr. Christopher Taylor, an Arkansas-licensed physician, maximizes implantation of InterStim through numerous medically unnecessary procedures to credulous elderly patients.

20.    Medtronic is aware that Dr. Taylor performs more InterStim procedures than is realistically medically necessary, yet, until recently, Medtronic provided him with improper support and kickbacks in the form of contributions to marketing events designed to push patients into InterStim implants. The patients who attend these Medtronic-sponsored events hosted by Dr. Taylor are often screened and signed up for a PNE procedure that same day. While the average provider does about eight InterStim implants a year, Dr. Taylor performs hundreds of InterStim implants a year. Upon information and belief, Dr. Taylor performs more InterStim procedures annually than many entire hospital systems.

## II.    PARTIES

21.    The Relator, Simon Kent, is a former sales manager with Medtronic. He joined Medtronic in June 2010 as a sales representative for InterStim. In May 2012, he became a trainer focusing on OAB third-line therapy. In April 2013 he was promoted to sales manager, responsible for the Dallas and Oklahoma areas. Mr. Kent raised concerns about Medtronic's practices, particularly the practices related to NNS, as early as 2016. After continually raising these concerns, Mr. Kent forced Mr. Runkle to finally address his conflict with his direct reports. Soon after Medtronic initiated an investigation of Mr. Kent and thereafter fired Mr. Kent on November 3, 2020.

22.     Medtronic PLC is the world's largest medical device company, with most of its revenues generated from the United States healthcare system. Medtronic is headquartered in Dublin, Ireland for tax purposes and has its executive headquarters in Fridley, Minnesota.

23.     Nurse Navigation Solutions LLC (NNS) is a Pennsylvania based company owned and operated by Amy Hohman-Runkle with headquarters at the Runkles' home at 812 Luzerne Street, Johnstown, Pennsylvania. All of NNS's clients are sourced by Medtronic to navigate OAB.

24.     Amy Hohman-Runkle is the owner and operator of NNS. She controls NNS and is responsible for its operation. She is married to Chris Runkle, one of two Regional Sales Directors at Medtronic.

25.     Christopher Wayne Taylor, M.D., is an Arkansas-licensed physician practicing in Harrison, Arkansas. Dr. Taylor specializes in Obstetrics & Gynecology and maintains an office at 1425 Rock Springs Road, Harrison, Arkansas 72601.

26.     UroGPO is a group purchasing organization headquartered in Rocky River, Ohio. UroGPO was founded in 2013 and focuses solely on urology products and services. Medtronic contracted with UroGPO on March 20, 2018.

27.     PPS Analytics is a technology company headquartered in Independence, Ohio. Medtronic began offering PPS Analytics to physicians in 2016. On or around 2019, PPS Analytics was acquired by UroGPO.

## III.     JURISDICTION AND VENUE

28.     This action arises under the False Claims Act 31 U.S.C. §§ 3729-33 (FCA).

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which

specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

30.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, Relator would qualify as an "original source" of the information in this Complaint, even had such a public disclosure occurred. This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they all can be found in and transact business in this District, including with the United States Department of Health and Human Services, which is headquartered within this District.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

IV.     **PROTECTIONS FOR FEDERAL AND STATE-FUNDED HEALTHCARE PROGRAMS**

32.     Government-funded health care programs cover medical services and prescriptions for one-third of the United States population.

33.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 years old or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. In addition to enrollment agreements, the vast majority of

health care providers elect to enter into Medicare participation agreements, which allow the beneficiaries' claims to be assigned directly to the provider. Pursuant to Medicare Participation Agreements, payments under Medicare Part B are typically made directly to service providers and practitioners, such as physicians, rather than to the patient or beneficiary. In that case, the physician bills the Medicare Program directly.

34. The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS. Medicare Administrative Contractors (MACs) are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

35. To bill Medicare, a physician must submit an electronic or hard copy claim form called a CMS 1500 form to the carrier. When the CMS 1500 form is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were "medically indicated and necessary for the health of the patient." Physicians wishing to submit the CMS 1500 form electronically must submit a provider enrollment form.

36. For a claim to be paid by the Medicare Part B Program, the claim must identify each service rendered to the patient by the physician. The service is identified through a corresponding code that is listed in the American Medical Association publication called the Current Procedural Terminology (CPT) Manual. The CPT Manual is a systematic list of codes for procedures and services performed by or at the direction of a physician. Each procedure or service is identified by a five-digit CPT code.

37. The Civilian Health and Medical Program of the United States, now known as TRICARE, 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by

civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE pays for, among others, medical devices and surgeries for its beneficiaries.

38.     The Federal Employee Health Benefits Program (FEHBP) provides healthcare benefits for qualified federal employees and their dependents. It pays for, among others, medical devices and surgeries for its beneficiaries. Under the FEHBP, the federal employee is covered by private payor health insurance which is in turn subsidized in part by the federal government. As a result, fraud on a patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

39.     The federal government operates hospitals, including through its Departments of Defense (DOD) and Veterans Affairs (VA), and receives and uses federal funds to provide medical devices and surgeries to patients treated at these facilities and otherwise, as well as outpatient services. Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Health Care Programs."

40.     The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), prohibits the knowing and willful payment of remuneration to induce or reward patient referrals, arrangement, or recommendation, involving any item or service payable by the Federal health care programs. A claim tainted by a violation of the AKS is *per se* material.

41.     There are exceptions to the AKS, including a payment between an employer and an employee and a rebate agreed and written in advance. A rebate, however, cannot be contingent on a beneficiary taking affirmative steps to generate additional business for the seller.

V.        **TREATMENT FOR OVERACTIVE BLADDER**

42.       Approximately 33 million Americans suffer from an overactive bladder, referred to in the medical community as OAB. OAB is defined by the International Continence Society as "urinary urgency with or without urge urinary incontinence, usually with frequency and nocturia."[1]

43.       There are various treatments for OAB, including many medications and non-surgical therapies. These treatments are the most widely used, cheapest, and least invasive ways to treat OAB and are therefore referred to as first- and second-line therapies.

44.       However, for some patients, these therapies are ineffective. These patients are therefore eligible for what are known as third-line therapies.

45.       There are three generally accepted third-line therapies for OAB: Botox, Percutaneous Tibial Nerve Simulation (PTNS), and InterStim.

46.       Botox therapy for OAB involves filling the bladder with sterile water and injecting Botox into various points in the bladder wall. This minimally invasive procedure is often performed at a physician's office. If performed at a physician's office, Medicare reimburses approximately $370. If performed at a surgery facility, Medicare reimburses the physician approximately $176 and the facility approximately $650.

47.       Tibial nerve simulation is offered through either Medtronic's Percutaneous Tibial Neuromodulation (PTNM) or Laborie's Percutaneous Tibial Nerve Stimulation (PTNS). Patients go to the physician's office for 12 weekly, 30 minute sessions. During the session, a needle electrode attached to a stimulator is inserted near the ankle and into the tibial nerve to stimulate

---

[1]       https://www.nafc.org/overactive-bladder#:~:text=Also%20sometimes%20called%20%E2%80%9Cspastic%20bladder,people%20in%20the%20USA%20alone.

the nerve with a mild electrical pulse. That pulse travels to the sacral nerve plexus, the nerves responsible for the bladder function. Medicare reimburses $132.48 for each session.

48. InterStim, the last of the three third-line therapies, is the most invasive. It involves the direct stimulation of the sacral nerve through Sacral Nerve Stimulation (SNS) and requires an implanted electrode next to the sacral nerve and an implanted device to regulate the neuromodulation. The American Urological Association (AUA) only recommends SNS for patients "characterized by severe refractory OAB symptoms." *Diagnosis and Treatment of Non-Neurogenic Overactive Bladder (OAD) in Adults: an AUA/SUFU Guideline (2019)* at ¶ 20. The other third-line therapy options do not come with a similar limitation for only "severe refractory."

49. Before a physician can perform a full InterStim implant, the physician must first demonstrate InterStim is likely to help a patient's symptoms improve by 50 percent or more. This is accomplished through either a Peripheral Nerve Evaluation (PNE) or a Stage 1 implant. Medtronic refers to the PNE as a Basic Evaluation and the Stage 1 implant as an Advanced Evaluation.

50. PNE is a minimally invasive procedure with no incision. The average PNE procedure lasts from 15-30 minutes. It can be done in the physician's office under local anesthesia. The PNE can also be done in the surgical setting under general anesthesia or Monitored Anesthetic Care. The physician inserts two small, thin wires under the skin near the tailbone, where nerves that control bladder and bowel function are located. The two wires are attached to an external device which accompanies the patient for approximately three to five days. The device provides mild pulses of energy to the nerves that control the bladder. Medicare reimburses approximately $1,100 if this procedure is performed at the physician's office.

Medicare reimburses the physician $317 and the facility $7,026 if the procedure is performed at an ambulatory surgery center.

51.     The Stage 1 implant is an implant of the InterStim lead and an external modulator. The procedure must be done in a surgical setting under general anesthesia or Monitored Anesthetic Care. The trial generally runs two weeks. Medicare reimburses the physician approximately $692 and the facility $4,844 for this procedure.

52.     The patient must show a 50 percent improvement in symptoms to be eligible for a full InterStim implant. The patient keeps a diary of all their voiding (using the restroom, waking up in the night, pad use, and accidents) in order to calculate any improvement. CMS specifically requires that the patient is capable of recording the voiding diary because the contemporaneous voiding diary is the only way to determine if the test is successful. *See National Coverage Determination (NCD) for Sacral Nerve Stimulation for Urinary Incontinence* (230.18). The diary from before and after the test are compared and should be kept in the physician's records to support medical necessity for the procedure.

53.     The process for a full InterStim implant depends on whether the patient underwent PNE or Stage 1. If the patient used the PNE test, then the PNE is removed and the InterStim lead and internal neurostimulator are implanted. If the patient had a Stage 1 implant, the external components are removed, and the lead is attached to an internal neurostimulator. Medicare reimburses the physician $167 and the facility $22,137. The physician receives an additional $692 if the physician removes the PNE.

54.     There was no competing SNS product to InterStim until October 2019, when a competing neurostimulator came to market. The vast majority of SNS implants are still InterStim.

**VI.    MEDTRONIC PROMOTES THE OVERUSE OF INTERSTIM**

**A.    Medtronic Offered "White-Glove" Support to Physicians.**

55.    Medtronic employs a sales force of 130 Sales Representatives, approximately 70 Clinical Specialists, 20 District managers, and two Regional Sales Directors solely focused on promoting the use of InterStim. This sales force is highly compensated, with compensation primarily based on commission. A sales representative's base salary is generally around $75,000 but they regularly make over $200,000 in commission for a total compensation of a quarter of a million dollars a year. Top performing sales representatives can receive over half a million dollars in total compensation each year.

56.    Medtronic sales representatives are trained to provide full-service support to their target physician practices and are involved at every stage of the InterStim process.

57.    Medtronic trains the physician's practice on how to convince patients to use InterStim instead of less invasive options.

58.    For example, InterStim sales representatives create a "Care Pathway" for physicians' offices that are biased towards InterStim. The below is the example of a Care Pathway created for a physician. Tellingly, the Care Pathway calls for an InterStim test, referred in the document as a "Nerve-Test," before the doctor even discusses the third-line treatment options with the patient. Therefore, the patient undergoes an InterStim procedure before even knowing about other third-line therapies. Additionally, the Care Pathway highlights the frequency of follow up for each third-line therapy, highlighting that PTNS is every month, Botox is every 6-9 months, and InterStim is every 4-5 years.



59.     When a physician's practice convinces a patient to try InterStim, the Medtronic sales representative becomes the primary point of contact for the patient. The office coordinates scheduling the initial procedure with the sales representative's schedule. The sales representative will dress in scrubs and meet the patient in the patient's room the day of the initial procedure, explain the procedure, and supervise the physician as they implant the test device. The sales representative, or a third party designated by the sales representative, will follow up with the patient to discuss and document the voiding diary. The sales representative will follow up with

the physician to discuss if the test is effective and inquire whether a full InterStim implant is warranted. The sales representative is again in scrubs for the pre-op, surgery, and post-op for the InterStim implant. The patient will often follow up with the sales representative for any questions he or she may have about the procedure or its after-effects. Some physicians even tell the patients to follow up with the Medtronic sales representative if there are any problems with the InterStim implant.

60.     The sales representatives encourage a biased calculation of the test's effectiveness. The sales representatives will take an "oral voiding diary" of the patient's pre-test symptoms—the representative recording the patient's recollection of their symptoms, often coached to overstate their symptoms. Then the patient will actually record their symptoms during the test and necessarily record less from the inflated baseline. The sales representatives therefore stack the deck in favor of InterStim and lead the patient to believe the test is effective.

61.     Medtronic also consults on the business case for InterStim. For example, the below proforma would be used by a Medtronic sales representative to encourage a physician who owned their surgery center to perform more InterStim. The pro forma explains that performing fewer than ten InterStim implants can lead to $166,495 in revenue for the physician. Most proformas were more aggressive and assumed more InterStim procedures and therefore more revenue:

## Annual Trial and Implant Summary

| Basic Evaluations | INTERSTIM II | NTERSTIM MICRO |
|---|---|---|
| Total Estimated Reimbursement of Percuateneous Lead Test Stimulation | $6,161 | $6,161 |
| Total Estimated Expenses of Percutaneous Lead Test Stimulation | $560 | $560 |
| **Estimated Reimbursement Net of Estimated Expenses** | **$5,601** | **$5,601** |
| **Total Projected Basic Evaluations** | **3** | **2** |
| **Total Revenue by Volume (Basic Evaluation Procedures)** | **$16,802** | **$11,201** |

| Full System Implant Procedures | INTERSTIM II | NTERSTIM MICRO |
|---|---|---|
| Total Estimated Reimbursement of Permanent Lead and Neurostimulator Implant | $20,480 | $20,480 |
| Total Estimated Expenses Full System Implant | $19,484 | $19,484 |
| **Estimated Reimbursement Net of Estimated Expenses** | **$996** | **$996** |
| **Total Projected Full System Implants** | **10** | **10** |
| **Total Revenue by Volume (Full System Implants)** | **$9,958** | **$9,958** |

| Stage 1 Implants (Advanced Evaluations) | INTERSTIM II | NTERSTIM MICRO |
|---|---|---|
| Total Estimated Reimbursement For Stage 1 - Permanent Lead Implant | $6,161 | $6,161 |
| Total Estimated Expenses of Staged Implant - Stage 1 | $5,204 | $5,204 |
| **Estimated Reimbursement Net of Estimated Expenses** | **$957** | **$957** |
| **Total Projected Stage 1 implants** | **6** | **6** |
| **Total Revenue by Volume (Stage 1 Implants)** | **$5,740** | **$5,740** |

| Stage 2 Implants and IPG Replacements | INTERSTIM II | NTERSTIM MICRO |
|---|---|---|
| Total Estimated Reimbursement For Stage 2 - Neurostimulator Implant | $20,480 | $20,480 |
| Total Estimated Expenses of Staged Implant - Stage 2 | $14,530 | $14,530 |
| **Estimated Reimbursement Net of Estimated Expenses** | **$5,950** | **$5,950** |
| **Total Projected Stage 2 Implants and IPG Replacements** | **9** | **9** |
| **Total Revenue by Volume (Stage 2 Implants)** | **$53,548** | **$53,548** |

| Total Estimated Revenue | INTERSTIM II | NTERSTIM MICRO |
|---|---|---|
| Total Revenue by Volume (Basic Evaluation Procedures) | $16,802 | $11,201 |
| Total Revenue by Volume (Full System Implants) | $9,958 | $9,958 |
| Total Revenue by Volume (Stage 1 Implants) | $5,740 | $5,740 |
| Total Revenue by Volume (Stage 2 Implants) | $53,548 | $53,548 |
| **Total Revenue** | **$86,048** | **$80,447** |
| **Total Revenue Combined** | | **$166,495** |

### B.    Medtronic Paid Kickbacks Through Its Signature Solutions Service.

62.    Medtronic has a division of Strategic Account Managers that oversees a service called Signature Service and Solutions. The role of the Strategic Account Manager is to support

sales by offering the Signature Service and Solution product to physicians to support their practice.

63.    The Signature Service and Solutions consists of two main components: a data analytic tool called PPS Analytics and a nurse navigation service through NNS.

64.    While physicians pay for Signature Service and Solutions, they do not pay market rates. Instead, Signature Service and Solutions is a loss leader for Medtronic. The price that physicians pay varies, however the product offering does not. Medtronic varies the payment based on the Strategic Account Manager's perception of the physician's willingness to pay. Medtronic understands that the purpose of PPS and NNS is to increase the use of InterStim.

**1.    Medtronic Offered PPS Analytics at Below Market Rates.**

65.    PPS Analytics was originally developed as a software to identify Advanced Prostate Cancer in a physician's patients. PPS uses the records from a physician's EMR to perform advanced data analytics that identifies patients who need treatment.

66.    Upon information and belief, Medtronic identified the potential for PPS to generate more leads among OAB patients eligible for InterStim. Medtronic provided PPS the support necessary to expand its product offering to OAB.

67.    Medtronic has exclusive rights to PPS for OAB even though Medtronic cannot itself use PPS and, upon information and belief, makes no profit off PPS sales. Medtronic uses its InterStim sales force, which earns commission solely through the sale of InterStim, to promote PPS.

68.    Upon information and belief, Medtronic provides PPS to physicians' practices at less than its own cost of procuring PPS and managing the PPS sales process. This constitutes a kickback to the physicians.

### 2.    Medtronic Engaged a Shadow Sales Force Through Navigators.

69.    Nurse navigation is designed to guide patients through a course of treatment to eliminate barriers to timely care. Navigation can be an important part of patient centered care for complex treatments, such as oncology. The point of navigation is to help a patient coordinate a complicated treatment plan across multiple specialties. *See Overview of Nurse Navigation*, Cynthia A. Cantrill, available at:

https://www.ons.org/sites/default/files/publication_pdfs/Oncology%20Nurse%20Navigation%20sample%20chapter.pdf.

70.    However, companies have begun to take navigation out of its traditional patient-centric role and instead use it to push the overuse of medical care. This has occurred in pharmaceuticals use of "nurse ambassadors," to push the continued use of expensive treatments. *See Problematic Promotion of Medications by Nurse Ambassadors – Legal and Ethical Issues*, Yang, Mason, JAMA, Jan. 13, 2021.

71.    Upon information and belief, there is no other specialty that uses navigation for an elective medical procedure like the implantation of InterStim. Further, Medtronic set up the navigation either directly or indirectly through NNS for every physician practice that uses navigation for OAB. Medtronic is transforming a patient-focused, medically necessary practice from oncology into a way to push the overuse of an expensive and invasive procedure.

72.    Medtronic created this new scheme whereby Medtronic created a third-party organization, Nurse Navigator Solutions LLC, to clandestinely promote the use and overuse of InterStim.

73.     Upon information and belief, Chris Runkle devised a navigator program to promote the use of InterStim. At the time, Mr. Runkle was a Strategic Account Manager at Medtronic whose focus was supporting the InterStim sales staff.

74.     Mr. Runkle's wife, Amy Hohman-Runkle, formed NNS in September 2015 and used the Runkles' home address as the address for the newly-formed business.

75.     Upon information and belief, Medtronic provided all the necessary support to start NNS, including administrative staff necessary to provide services and advertising and design to market its product.

76.     Medtronic continues to devote significant resources to supporting NNS including:

a. Medtronic's full InterStim sales force that prospects, identifies, and acquires accounts (through Signature Service and Solutions). The sales force does not receive any commission for selling NNS or SSS but instead is compensated by the increased use of InterStim after NNS pushes InterStim use through navigation;

b. Local support for every account spread across the United States. Medtronic employees support local navigators when any issue arises such as patient selection and insurance issues, and Medtronic provides local hands-on support for any account NNS services remotely;

c. Regular business reviews with the physician accounts highlighting the benefits of navigation;

d. Facilitation of all communications with the physician accounts and ensure any NNS action item is completed;

e.  Medtronic employees set up all meetings with physician practices and encourage the meetings through paying for busines development activities such as physician lunches and dinners;

f.  Creation of NNS's marketing and training material;

g.  General administrative support such as facilitating execution of NNS's contracts;

h.  Ensure physician practices use PPS Analytic software necessary for NNS to navigate patients;

i.  Provide sales data to NNS at no cost;

j.  Organization, promotion, and hosting navigator roundtables where NNS and Medtronic can market and train Medtronic practices to navigators;

k.  Free inclusion in a conference organized, promoted, and paid for by Medtronic called the "Signature Solutions Summit" in Atlanta that promotes NNS's services;

l.  Design and creation of NNS's patient facing materials given to prospective NNS patients; and

m.  Technical support for the integration of NNS's navigation program into the physician's electronic medical records (EMR).

77.  These benefits are provided exclusively to NNS. Medtronic does not offer this support to any other vendor and has never competitively bid navigation service.

78.  NNS has no in-house sales staff. Instead, the supposedly independent company relies entirely on Medtronic to identify prospective clients for navigation. To accomplish this goal, Medtronic's InterStim sales representatives are instructed to promote NNS to physician-owned surgery centers, focusing on the practices that perform the most InterStim procedures. Medtronic's InterStim sales representatives do not receive any compensation for the promotion

of NNS, and NNS does not pay Medtronic for this service. Instead, Medtronic's InterStim sales representatives are told that if a physician's practice uses NNS then the physician's InterStim use (and revenue) will increase.

79.     Chris Runkle, one of two Regional Sales Directors reporting to the Vice President of Sales, is responsible for the allocation of Medtronic's InterStim sales budget. He is therefore able to steer funds to NNS for the benefit of a company owned and controlled by his wife.

80.     Kristen Comstock is a Medtronic employee and the primary liaison with NNS. She previously worked in marketing and provides significant assistance to NNS such as arranging meetings with physician practices, coordinating training of the navigators, providing logistics for the navigators, and conducting regular business reviews with the physician practices about NNS's work. NNS does not pay Medtronic for these services.

81.     Medtronic initially took primary responsibility for training the NNS navigators. Medtronic taught NNS how to pitch patients to choose InterStim as a third-line therapy. Medtronic provided the navigators with the sales representatives "talk track" designed to promote InterStim over other third-line therapies. Medtronic also provided NNS information regarding how to pitch non-Medtronic treatment options. This information was biased and highlighted InterStim as a superior option despite its invasive nature and excess cost. While NNS now trains its navigators directly, Medtronic sales representatives are still involved and NNS's training is based off the original biased materials and training by Medtronic.

82.     Additionally, Medtronic and NNS train a physician practice's in-house navigators. The training is the same as offered to NNS's navigators and teaches the physician's in-house navigators to push InterStim.

83.     For example, in March 2017, Julie Cole, a Senior Strategic Account Manager at Medtronic, advertised a navigator training to InterStim sales representatives. The training focused primarily on the InterStim "talk track" and promotion of InterStim to potential patients. While the trainer, Sharon Possehl, is advertised as a "NP [nurse practitioner] from Grand Rapids, MI" she is in fact a Medtronic employee.

> Good morning all,
> Happy St. Patrick's Day! I wanted to let you know that we will be hosting a webinar training for nurse navigators. The webinar will be led by Sharon Possehl and will focus on navigator talk tracks for NURO and InterStim. For those that don't know Sharon, she is an NP from Grand Rapids, MI. She works closely with Dr. Jannah Thompson – both of whom have been Medtronic faculty for years. She's a fantastic educator! She will cover patient selection, quick overview of how the technologies work, patient talk tracks and common patient questions. The MedEd team will have an official invite soon, but I wanted to put this on your radar. The intended audience for the training is NNS navigators as well as internal practice navigators. NNS has been notified of the training dates, but please feel free to share the dates and times below with any internal practice navigators that you work with. In an effort to accommodate as many navigators attending as possible, we will host two webex meetings (see dates/times below) and record the sessions for future on-demand viewing.

As stated in the email, the training "will focus on navigator talk tracks for NURO and InterStim[,]" both Medtronic products. There is no similar talk track for Medtronic's competitor's products.

84.     Peter Scott followed up to the same email providing further detail on the training. Specifically:

> We have sent an invitation out to nurse navigators to join us and Sharon Possehl for a webinar: Guiding Patients to the Right Level of Care, The Role of the Nurse Navigator
>
> The webinar will be led by Sharon Possehl, NP and will focus on:
> - Tibial and Sacral Neuromodulation
> - Patient selection
> - Quick overview of how the technologies work
> - How to introduce the therapies to patients
>
> - Common patient questions.

This training makes clear it is about "how to introduce the therapies to patients." The therapies referenced are Tibial and Sacral Neuromodulation, known as PTNS, and InterStim, both Medtronic products.

85. As another example, in October 2020, Ms. Comstock reached out to a urology practice about training their in-house navigator. The practice questioned why Medtronic was gaining access to the practice's patient information. Ms. Comstock responded:

> see patient-level data. That said, we have a Navigator Trainer, Christine Hancock MSN, who we've retained to deliver navigator training. She works with Nurse Navigator Solutions (NNS) and she helps us to train navigators. She covers OAB disease state, how to educate patients, how to optimize use of PPS Portal, etc etc.

86. As used in this email, "educate patients" means provide Medtronic's InterStim sales "talk track." Medtronic, through its kickbacks to NNS, creates the false appearance of NNS's independence and thereby converts unwitting in-house navigators into shadow Medtronic sales representatives.

87. When NNS navigators have questions on how to navigate patients, they go to the Medtronic sales representatives or Medtronic Strategic Account Managers. Medtronic thus ensures the navigators are providing information that will steer patients to InterStim. For example, in the email below, Kelly Parson, an NNS navigator, emails Medtronic sales representatives inquiring how to best educate patients about InterStim:

-24-

From: Kelly Parsons [mailto:kellyp@nns-llc.com]
Sent: Wednesday, February 22, 2017 3:56 PM
To: Kanel, Casey <casey.kanel@medtronic.com>; Kent, Simon <simon.kent@medtronic.com>; Schultheis, Chris <chris.schultheis@medtronic.com>
Subject: InterStim

Good afternoon!
I am emailing because I was wondering if one of you could give me some info on the InterStim protocol for Drs Powell and Murray (USO).
I am not sure if they do office PNE then move on to Stage I then Stage II, or what their standard procedure is.
As we are moving along with USO, I want to be sure that I will be educating their patients with the correct information.
Any detailed info you could send me would be great and much appreciated.
If you think it would be better explained in a phone conversation, we could set that up as well.
Thank you!
Regards,
Kelly Parsons

88.     Medtronic knew the navigators trained to sell InterStim were a valuable resource it needed to protect. In 2018, Ms. Hancock forwarded an email to a Medtronic Strategic Account Manger regarding an in-house navigator's failings on the job. The Strategic Account Manager forwarded that email to two Medtronic InterStim sales representatives stating:

Guys, see below.  Do NOT discuss with the docs or Cliff.  Let me handle it.  You see, this is why we need TRAINING for these folks.  Again, don't discuss.  You could get her in trouble and I can't have that.

89.     Medtronic wanted to protect the navigator and expected its InterStim sales representatives to provide training. Medtronic also wanted to protect the navigator from her own employer, the physicians' office, because Medtronic knew these navigators were trained as shadow sales representatives to improperly recommend InterStim to patients, driving revenue to Medtronic. In short, they were too valuable to replace.

90.     Medtronic sales representatives would regularly host business reviews conducted by Strategic Account Managers for physicians at expensive restaurants. The meetings would review how navigation caused the practice to increase billable encounters with each patient, maximizing revenue for the practice at the government's expense.

91.     NNS sold its services by touting that third-line therapies, and specifically InterStim, would increase. Specifically, they explained that their efforts boosted third-line therapy numbers for patients at participating practices. As Ms. Hohman-Runkle stated:

I'm less worried about 3rd line therapy numbers in the portal and more worried about getting direct referrals (or at least approval to enroll from the identified portal patients). If we have the patients enrolled and navigated-- testing and third line numbers should subsequently follow.

92.     NNS's website specifically advertises that navigation moves more patients to third-line therapies:



The data for this chart is compiled by Medtronic and provided to NNS at no cost. As is apparent from these ongoing marketing efforts, the fraudulent scheme is ongoing, and Medtronic and

NNS intend to continue using the NNS shadow sales force to drive InterStim overuse for the foreseeable future.

93.    Medtronic itself tracked how much navigation increased InterStim use. For example, Medtronic provided the practice group Urologic Specialists a presentation a year after using NNS showing an over 100 percent increase in InterStim testing (AE – the Stage 1; or Basic Eval – the PNE test) and a 72 percent increase in InterStim implants:





94.    Medtronic also makes certain NNS's clients are already inclined to use InterStim. In fact, Medtronic only offers NNS's services to physicians who are in the top 25 percent of InterStim purchases. Medtronic deploys NNS to the places where it can generate the most revenue by boosting InterStim use by InterStim-friendly practices.

95.     This relationship violated the AKS because Medtronic provided renumeration to NNS in exchange for NNS promoting InterStim. In the alternative, Medtronic offered NNS's services to physicians at less than cost as renumeration for physicians' promotion of InterStim.

**C.     Medtronic Paid Kickbacks Through the Group Purchasing Organization UroGPO.**

96.     UroGPO is a group purchasing organization (GPO) focused on urology. As a GPO, it offers physician practices discounted goods and services it obtains through bulk agreements with various providers.

97.     Medtronic contracted with UroGPO on July 22, 2017.

98.     The relationship violates the AKS because the design of Medtronic's UroGPO program provides an additional rebate if the physician increases their InterStim use year-to-year. This creates an improper contingency in the rebate that the practice must promote further use of InterStim.

99.     GPOs typically offer volume-based discounts. The more you purchase, the cheaper a product or service is.

100.    Providers contract with GPOs because of market pressures from competition— they need to keep their product reasonably priced or physicians will use a competing product. However, when Medtronic contracted with UroGPO in 2018, there was no competition for InterStim. Medtronic was instead focused on increasing the use of InterStim. Additionally, Medtronic signed an exclusive agreement with UroGPO thereby discouraging competing products from entering the market.

101.    Medtronic offered discounts through UroGPO based on the increased volume year-to-year. The tiers were as follows:

| Supplier Products Annual Growth Over Baseline Calculated/Paid Quarterly | Supplier Products Rebate % Earned Quarterly |
|---|---|
| 10.00% - 15.00% | 3.00% |
| 15.01% - 20.00% | 5.00% |
| 20.01% + | 7.00% |

102.    Medtronic incentivized growth instead of providing a traditional volume-based discount. This form of rebate required physicians to increase their InterStim use annually to qualify and is therefore an improper contingency built into the rebate.

103.    For example, in the below email, a Medtronic sales representative, is informing a practice the amount of additional InterStim procedures they need to perform to receive the rebate:

I wanted to give an update early in the year so that we are not trying to play catch up at the end of March.

First off, you guys did an amazing job in December with InterStim and were able to complete enough implants to achieve your maximum 7% UroGPO rebate for the last quarter of the year ($17,713)

With this rebate, this lowers the cost of your InterStim system by $1,019.55.

List price for a system is 17,225.  With the rebate, you save $3,679 per system.

- ASC Reimbursements have increased again for 2019 with InterStim.  I'll have more zip code specific information on that as in comes available.

- Your new quarterly baseline expenditures that will be measure for growth = $271,176

- Your target for the maximum 7% rebate is $325,412.  By hitting this target, you will achieve a rebate of $22,779.

- If you break this down into number of implants needed, at 325.4K, with your implant price of $14,565, you need = 22.3 implants or roughly 7-8 implants per month.  Last month (December 2018) you collectively performed 12 implants.

- Holly was able to provide a list of over 330 patients to Aimee that are potentials for revision.

- Aimee also has 5-6 patients that she was waiting until after the 1st of the year to get on the schedule to test.

- We haven't heard anything back in regards to those patients yet...we are willing to help in any way that we can.

I'm now being copied on a weekly email chain that includes your progress to the UroGPO contract.  I'll provide you an update each month as to how you are tracking and at any time, if you have questions, please feel free to reach out.

Happy New Year to everyone and please let us know what you need,

## D.      Medtronic Provided False Records to RAC Audits.

104.    Recovery Audit Contractors (RACs) perform audits of Medicare claims to ensure the claims meet Medicare's requirements. If a RAC audit discovers any claims that violate Medicare requirements, the RAC will require the provider to reimburse Medicare for the problematic claims. One standard portion of a RAC audit is to review a physician's file to ensure a procedure is medically necessary.

105.    An InterStim procedure is only medically necessary if the physician documents a 50 percent improvement in the patient's OAB symptoms after the InterStim test period. As described above, a physician documents this improvement through patient diaries of his or her voiding before and after the test.

106.    Medtronic sales representatives routinely collect these voiding diaries for physicians. Because these voiding diaries contain HIPAA protected information, Medtronic stores voiding diaries in an electronic system called NLink. Sales representatives are not allowed to keep copies of voiding diaries outside of NLink. This system tracks the details about the documents contained within it, including when the document was uploaded and by whom.

107.    While physicians are supposed to keep sufficient documents to support the InterStim procedure, many physicians outsourced this duty to Medtronic. Accordingly, in these instances, when a RAC audits the surgery center's InterStim procedures, neither the surgery center nor the physician possesses any of the records required to support the procedure. Instead, they turn to the Medtronic sales representative to provide the documents necessary for the audit.

108.    But Medtronic sales representatives often either fail to collect the diaries or collect the diaries but do not save them. In these instances, there are no documents in NLink to support the InterStim procedure.

109.    If no documents exist in NLink for a particular procedure, the sales representative must either forge documents to make it appear the procedure was adequately supported and medically necessary or force the center and physician to fail the RAC audit.

110.    Medtronic sales representatives often choose to forge the documents. When the sales representative forges the document, NLink will either have no document or the date of the

upload to NLink will be around the time of the RAC audit rather than around the time of the procedure.

111.    If the sales representatives do not forge the documents when none exist in NLink, the physician has no ability to support the medical necessity of the procedures, because the procedures were not supported at the time the physician performed them. Thus, without such documentation, a RAC audit would require the physician to reimburse Medicare for the cost of the procedure.

112.    Practice 1 was subject to a RAC audit within the last two years. The Medtronic sales representative was Individual 1.

113.    Upon information and belief, there were no records in NLink to support some of the audited procedures and Individual 1 therefore created documents to support the procedure. Individual 1 provided these fraudulent documents to Practice 1 who then provided them to the RAC auditor.

114.    Practice 2 was subject to a RAC audit within the last two years. The Medtronic sales representative was Individual 2.

115.    Upon information and belief, there were no records in NLink to support some of the audited procedures and Individual 2 therefore created documents to support the procedure. Individual 2 provided these fraudulent documents to Practice 2 who then provided them to the RAC auditor.

116.    Practice 3 was subject to a RAC audit within the last two years. The Medtronic sales representative was Individual 3.

117.    Upon information and belief, there were no records in NLink to support some of the audited procedures and Individual 3 therefore created documents to support the procedure.

Individual 3 provided these fraudulent documents to Practice 3 who then provided them to the RAC auditor.

E.    **Medtronic Was Aware Dr. Taylor Was Performing Medically Unnecessary InterStim Procedures Yet Continued to Provide Him Improper Kickbacks.**

118.    Emblematic of Medtronic's approach to maximizing InterStim use through any means necessary, upon information and belief, Dr. Christopher Taylor, an Arkansas physician specializing in Obstetrics and Gynecology, performed numerous medically unnecessary InterStim procedures.

119.    Upon information and belief, Dr. Taylor himself performs more InterStim procedures than many entire hospital systems and is the largest InterStim provider in the country.

120.    Dr. Taylor's website proclaims that InterStim is a "Life-changing Bladder Control Treatment." He further pronounces himself the "#1 provider of this therapy in the entire world" and claims to have treated over 25,000 women and performed over 2,500 sacral nerve stimulation procedures.

121.    Dr. Taylor advertises his practice through seminars designed to recruit elderly patients as patients for InterStim procedures. Upon information and belief, a Medtronic employee had the idea for the seminars and Medtronic initially provided Dr. Taylor financial support to organize the seminars. These seminars are held at restaurants in Arkansas, Oklahoma, Missouri, and Kansas such as the Golden Corral, River Grille, and Italian Garden. Dr. Taylor provides a free meal to attendees and pitches InterStim as an "exciting new therapy designed to treat anyone suffering from an overactive bladder."

122.    Medtronic provides Dr. Taylor lists of potential patients that Medtronic obtains through targeting data on specific demographics, which Dr. Taylor then utilizes to send invites.

-33-

123.    Because these seminars are conducted hundreds of miles from Dr. Taylor's clinic, Dr. Taylor offers transportation to bring patients both to his seminars and to his clinic. Upon information and belief, prospective patients are often bussed to a restaurant for the seminar and a free meal, then bussed directly to Dr. Taylor's practice to begin the process of seeking medical care for overactive bladder, and ultimately, an InterStim implant. Dr. Taylor indicates that he is "required to charge a small fee" for such transportation.

124.    Patients have repeatedly complained to the Arkansas State Medical Board about Dr. Taylor. For instance, patient S.M. submitted a complaint to the Board regarding the Medtronic implant procedure performed by Dr. Taylor.

125.    S.M. resides in Missouri and is covered by Medicare through Coventry Medicare Advantage Plan.

126.    S.M. also sent a detailed letter to Medtronic regarding Dr. Taylor "abusing his right to [Medtronic's] product. S.M. explained that in August 2016 she received a "random mailing" invitation to a seminar held at a Golden Corral buffet restaurant in Springfield, Missouri. At this seminar, Dr. Taylor painted a picture of InterStim as a "miracle" treatment which would permanently cure S.M.'s overactive bladder.

127.    S.M. subsequently visited Dr. Taylor's Arkansas practice for a consultation about InterStim where Dr. Taylor boasted that he "get[s] paid a lot for putting these in but not much for having to take them out." Despite having reservations about InterStim, S.M. ultimately agreed to and underwent the implantation procedure.

128.    S.M. almost immediately began experiencing discomfort and other problems with the device. During one of S.M's repeated calls to Dr. Taylor for follow-up about her displeasure with the device, Dr. Taylor reiterated that "it was all about the money." After numerous attempts

to schedule an appointment with Dr. Taylor to remove the device, S.M. finally scheduled the appointment only to have Dr. Taylor cancel it while the patient was in the waiting area, declaring he would not take device out. Contrary to indications from staff, S.M. followed all instructions given to her by Dr. Taylor and his staff. S.M. was ultimately forced to make an appointment with another provider to have the device removed.

129.    S.M.'s initial Medicare claim was denied. When she questioned Dr. Taylor about the denial, he "told her not to worry about that; he would get paid."  Dr. Taylor's only concern was his own remuneration, not patient care.

130.    Upon information and belief, on another occasion, representatives of Medtronic were made aware that Dr. Taylor performed a PNE on a patient who *already* had a device implanted which was working correctly. Despite this, Dr. Taylor implanted a PNE on the other side, then inserted a lead and connected her existing battery to the lead. Although this procedure was entirely unnecessary, upon information and belief, Dr. Taylor billed Medicare for the procedure.

131.    Medtronic is also aware that, on occasion, Dr. Taylor will perform an X-ray on a patient who is not at "goal" to see if a lead could be optimized for better improvement. Because the patient is not at "goal" he or she does not need the procedure as his or her device has already been implanted and is working properly.

132.    Medtronic knew or should have known that Dr. Taylor was performing medically unnecessary InterStim procedures to bill Medicare for as much money as possible. Medtronic ignored the warning signs because Dr. Taylor was the top purchaser of InterStim in the entire country. Rather than addressing the problem, Medtronic encouraged and supported Dr. Taylor.

133.   Indeed, Medtronic employees routinely attended and handed out flyers or otherwise assisted in advertising Dr. Taylor's patient education events.

134.   Medtronic, in fact, designed this program. The original flyers contained Medtronic's branding. Medtronic only stopped funding the program once multiple other practices complained that Dr. Taylor was marketing his practice so far from his own office— over an almost 300-mile radius.

135.   When Medtronic salespeople began performing similar advertising tasks for other physicians, Medtronic executives reacted swiftly to protect Dr. Taylor's market share in his region.

136.   Vice President of Sales Robert Cannon, in full knowledge that Medtronic provides similar services to Dr. Taylor, sent a missive to Division Managers for distribution among all Medtronic Pelvic Health Personnel indicating that:

- A Medtronic team member should never directly or indirectly involve themselves in patient education events that are scheduled and organized by a physician from outside their territory that would compromise the integrity of the event or negatively impact the customer and patient experience.
- A Medtronic team member should never attend a patient event (inside or outside) that they have not been directly invited to or have permission in advance to attend from the organizing physician.
- A Medtronic team member should never participate in anything that would undermine or compromise patient privacy or another customers efforts to educate patients in any community.

137.   As Mr. Cannon explained, Medtronic should not "involve ourselves in customer turf battles regardless if it's in a metropolitan or rural area." What went unsaid, however, was that Medtronic would go on protecting its highest earning provider from competition. Division Managers knew that Mr. Cannon was acting for the benefit of Dr. Taylor.

138.   Accordingly, this prohibition was not designed to ensure that Medtronic was in compliance with the law, but rather to ensure that only Dr. Taylor received the improper benefits Medtronic routinely gave him to reward his production and ensure that his outsized revenue production continued unabated.

139.    Medtronic was thus fully aware that the services it was providing to Dr. Taylor were in violation of the law.

## VII.    CLAIMS FOR RELIEF

**Claim for Relief I**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**
**(All Defendants)**

140.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

141.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment for InterStim.

142.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

143.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

144.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

145.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

146.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**
**(All Defendants)**

147.    Relator incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

148.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, in connection with the sale of InterStim.

149.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

150.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

151.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claim**
**(Medtronic)**

152.    Relator incorporates herein by reference each of the preceding paragraphs as if fully set forth in this paragraph.

153.    Medtronic knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, in connection with the sale of InterStim.

154.    As a result of Defendants' wrongful conduct, the Government incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests incurred losses, because an obligation to pay or transmit money was avoided.

155.    Relator cannot at this time identify all of the avoided claims for payment that were caused by Medtronic's conduct. The avoided claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

156.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Demand for Jury Trial**

157.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: February 19, 2021          **BLACK & BUFFONE PLLC**

By: _/ s/ Samuel J. Buffone, Jr._

John W. Black
D.C. Bar No. 989303
Samuel J. Buffone, Jr.
D.C. Bar No. 1721688
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
John@blackandbuffone.com
Sam@blackandbuffone.com

**LAW OFFICES OF ANDREW MARKS PLLC**

By: _/ s/  Andrew H. Marks_

Andrew H. Marks
D.C. Bar No. 932269
1001 Pennsylvania Ave., NW
Suite 1100
Washington, D.C. 20004
Telephone: (202) 618-9355
amarks@markslawoffices.com

***Attorneys for Plaintiff-Relator Simon Kent***